Filed 10/10/23  P. v. Okumura CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C097254 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F06549) |
| v. | |
| MICHELLE OKUMURA, | |
| Defendant and Appellant. | |

In February 2017, a jury convicted defendant Michelle Okumura of first degree murder (Pen. Code, §187, subd. (a)—count one),[1] torture (§ 206—count two), and false imprisonment.  (§ 236—count three.)  The jury also found true the enhancing allegations that defendant was armed with a firearm (§ 12022, subd. (a)(1)—tied to counts one & three) and personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)—tied to

---

[1]    Undesignated statutory references are to the Penal Code.

1

count two), but found the torture-murder special circumstance (§ 190.2, subd. (a)(18)— tied to count one) not true. We affirmed this judgment in an unpublished opinion issued January 30, 2019. (*People v. Okumura* (Jan. 30, 2019, C084467) [nonpub. opn.] (*Okumura*).)

Thereafter, on June 3, 2019, defendant filed a petition for resentencing under former section 1170.95 (now section 1172.6).[2] The trial court issued an order to show cause on the petition and held the section 1172.6, subdivision (d) evidentiary hearing on October 21, 2022. Following presentation of evidence and argument, the court denied defendant's resentencing petition, finding defendant was a major participant in the underlying robbery who acted with reckless indifference to human life. The court further found there was "overwhelming evidence" that defendant also was guilty of implied malice murder as an aider and abettor.

Defendant appeals, arguing substantial evidence does not support the trial court's determinations that she: (1) was a major participant in the underlying robbery; (2) acted with reckless indifference to human life; and (3) aided and abetted implied malice murder. Because we find substantial evidence supports the trial court's findings that defendant was a major participant in the robbery and acted with reckless indifference to human life, we do not reach her remaining argument. Accordingly, we will affirm.

---

[2] Effective June 30, 2022, the Legislature renumbered former section 1170.95 to section 1172.6. (Stats. 2022, ch. 58, § 10.) There were no substantive changes to the statute. We will refer to section 1172.6 throughout this opinion.

BACKGROUND

The evidence at the October 21, 2022 evidentiary hearing consisted of the clerk's and reporter's transcripts from defendant's original trial and defendant's evidentiary hearing testimony.[3]

A.      *Evidence from defendant's original trial*

Viewed in the light most favorable to the trial court's decision, the transcripts from defendant's original trial establish that defendant agreed to give the victim Eric Jackson a massage, and Jackson would give her credit she could use for tattoo work.  Defendant provided Jackson one massage without incident.  During a second massage on October 3, 2013, however, Jackson allegedly sexually assaulted defendant, who fled to her bedroom where her boyfriend Jeremy McMahon lay sleeping, and she waited for Jackson to leave.[4]  When Jackson left, he took the key to the front door of defendant's apartment and some marijuana he had brought as compensation for that particular massage.

Defendant told McMahon about the assault and theft.  McMahon was angry and, on October 5, obtained a .45-caliber handgun and ammunition from Jesse Detlefsen for "protection" from Jackson.  Defendant was there when Detlefsen provided these items to McMahon at her apartment.  The same day, McMahon texted Jackson and threatened to kill him.

---

**3**      While these transcripts were not included in the record originally prepared in this appeal, we granted defendant's motion to incorporate by reference the record from her prior appeal and have reviewed that record.

**4**      As we noted in our previous appellate decision, the original trial record is ambiguous as to Jackson's specific actions, ranging from "being handsy" to forcibly restraining defendant and penetrating her vagina with his fingers.  (*Okumura, supra*, C084467.)  We further acknowledge the record shows that Jackson engaged in inappropriate behavior with another woman in 2011.

The record shows defendant and McMahon communicated with Jackson by phone and text message numerous times on October 5 and 6. We describe only the most salient of those communications here.

At 3:50 a.m. on October 6, defendant and Jackson spoke for nine and a half minutes. At 4:11 a.m. Jackson texted, asking to "come inside and take a little nap," and defendant said he could. Jackson expected a sexual encounter. Consistent with this expectation, at 4:59 a.m. Jackson texted, "Honey, I'm home."

At some point in the early morning hours of October 6, Jackson entered the apartment using the key that he took. Rather than being greeted by defendant (who was in the kitchen), McMahon came out of the bathroom with the gun and ordered Jackson to get on the floor and turn over his clothes, wallet, and cell phone. McMahon fired two warning shots at the floor near Jackson's feet to get him to comply. McMahon then told defendant to tie Jackson to the massage table, and she tried, but McMahon ultimately gave her the gun to hold on Jackson while McMahon tied Jackson to the table. Defendant then returned the gun to McMahon. Jackson told them he had hidden a gun and money or drugs in the alley near defendant's apartment and would also split with them $15,000 he had buried in his yard if they would let him go.

Around 6:30 a.m. the same day (Oct. 6), defendant went to Detlefsen's home to borrow a shovel and told Detlefsen's girlfriend they had a man tied up at her apartment, that man had grabbed her inappropriately during a massage, and that she needed the shovel to dig up money or stocks he had buried at his home. Defendant called McMahon before she left and also texted him at 9:44 a.m. She first tried to find the money in the front yard of Jackson's home, returned to her apartment, and then went back to dig for the money in the backyard. Ultimately, defendant found nothing.

In the days that followed, McMahon took several photos of Jackson during his captivity. McMahon also had two videos on his phone of Jackson tied to the massage table, one of which showed Jackson screaming. Defendant told authorities she used

4

heated knives to burn Jackson and that he enjoyed it. She also admitted burning Jackson during a visit with McMahon at the police station, adding that "he deserved it."[5] Later, McMahon allegedly pistol-whipped defendant, then defendant went to the liquor store alone to buy beer and cigarettes.

Early on October 8, McMahon told defendant his life was over, and he put the gun in his mouth. McMahon removed the gun and placed it in defendant's mouth. He then took the gun out of defendant's mouth and fired the gun into a kitchen cabinet near where defendant was standing. Defendant felt suicidal, "took a lot of pills," and attempted to slit her wrists with a pocketknife.

Sometime later, Jackson tried to escape defendant's apartment, but McMahon shot him. Police found Jackson when they responded to a 911 call shortly after 3:00 a.m. He was in his boxer shorts, lying on his stomach in the broken glass of the sliding glass door that separated defendant's living room from the patio. He was lying partially on the patio, mumbling incoherently. Closer examination revealed he was shot, his nipples were burned or cut off, and a pattern had been burned into his lower chest/upper abdomen. Jackson told officers, "I'm dying." He still had shoe laces and other cords tied to his wrists, ankles, and neck. Jackson died at the scene of a gunshot wound to the abdomen. Given the lack of stippling or soot, the coroner opined Jackson was shot from at least two feet away.

Authorities found defendant inside the apartment. Her face was bruised, and she had dried blood around her mouth and nose. She smelled of alcohol, appeared to be under the influence of a depressant, and was slow to respond to questions. Nonetheless,

---

[5] Consistent with a retributive motive, at some point during his captivity, Jackson wrote and signed an apology note recovered by officers that read, "Eric Jackson, I am fully apologetic for my actions. I was in the wrong for coming to a second massage session and abusing my rights as a client."

5

after initially denying she knew anything, and later saying only that Jackson had tried to break in that night, which caused a delay in medical aid for Jackson, defendant eventually told two different officers that she had shot Jackson. McMahon later admitted he shot Jackson when he tried to escape and defendant retracted her confession. Both defendant and McMahon had gunshot residue on their hands.

B.     *Defendant's evidentiary hearing testimony*

Defendant's testimony at the evidentiary hearing was largely duplicative of the original trial evidence. Nonetheless, we highlight that defendant admitted she knew Jackson was coming to her apartment, McMahon was angry with Jackson and had prepared for his arrival, and defendant failed to warn Jackson to go away when he arrived. Jackson had placed defendant's key under her doormat, but rather than retrieving it, defendant left it there because McMahon wanted Jackson's fingerprints on the key and for him to come inside. Pursuant to that plan, Jackson used the key to enter the apartment, and McMahon used the gun to force Jackson to place his clothes and belongings in a bag. Defendant denied discussing what would happen to Jackson, but at the same time acknowledged McMahon wanted to beat him up. Finally, instead of awaking to shattering glass and screaming, as she had testified at the prior trial, defendant explained McMahon woke her up and she went into the kitchen. From there, she saw Jackson try to climb over the patio fence until McMahon pulled Jackson down and shot him. No further evidence was presented at the evidentiary hearing.

Considering the above described evidence, the briefing, and oral argument, the trial court determined beyond a reasonable doubt that defendant was a major participant who had acted with reckless indifference to human life. In light of this, the court determined defendant was still guilty of murder and would not be resentenced. Defendant timely appealed, and appellate briefing in this matter concluded on July 18, 2023.

6

DISCUSSION

A.      *Legal background*

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) "to amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  The bill amended the natural and probable consequences doctrine by requiring that a principal act with malice aforethought before he or she may be convicted of murder.  (§ 188, subd. (a)(3); accord, *People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*).)  As relevant here, the bill amended the felony-murder rule by providing that a participant in a qualifying felony is liable for murder only if that participant was a major participant in the felony and acted with reckless indifference to human life.  (§ 189, subd. (e)(3); accord, *Gentile, supra*, at p. 842.)

Senate Bill 1437 also added former section 1170.95 (renumbered as section 1172.6) (Stats. 2018, ch. 1015, § 4), which provides a petition procedure for persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" to seek vacatur of the conviction and resentencing. (§ 1172.6, subd. (a); accord, *Gentile, supra*, 10 Cal.5th at p. 853.)

If the trial court determines the defendant has made a prima facie showing that he or she is entitled to relief, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and to resentence the petitioner on any remaining counts." (*Gentile, supra*, 10 Cal.5th at p. 853; accord, § 1172.6, subds. (c), (d)(1).)  At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of

7

murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

The prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens. The admission of evidence at the hearing is governed by the Evidence Code. However, the court also "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1172.6, subd. (d)(3).)

We review the trial court's findings following the evidentiary hearing for substantial evidence, and the application of those facts to the statute de novo. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 412.)

B.     *Application*

Here, the trial court determined beyond a reasonable doubt that defendant was still guilty of murder under the law as amended by Senate Bill 1437 because the evidence established that defendant was a major participant in the robbery who acted with reckless indifference to human life. (§§ 189, subd. (e), 1172.6, subd. (d)(3).) Defendant argues substantial evidence does not support these determinations. We disagree.

The California Supreme Court decisions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) provide guidance on the "major participant" and "reckless indifference" elements of felony murder.

Whether substantial evidence supports a finding of reckless indifference to human life is a case specific inquiry. We look at the totality of the circumstances to determine whether there is substantial evidence defendant " ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." ' " (*Banks, supra*, 61 Cal.4th at p. 801; *In re Loza* (2017) 10 Cal.App.5th 38, 55 [the totality of the circumstances supported the reckless indifference finding].) *Banks* identified a series of considerations to help guide the inquiry into whether a defendant is a major participant: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the

8

defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Banks*, at p. 803, fn. omitted.)  The high court explained that none of these considerations is dispositive, and "[a]ll may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Ibid*.)

*Banks* also held that knowing participation in an armed robbery, standing alone, is insufficient to establish a defendant's reckless indifference to human life.  (*Banks, supra*, 61 Cal.4th at pp. 807-811.)  And, in *Clark*, the Supreme Court further held " 'reckless indifference' . . . encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark, supra*, 63 Cal.4th at p. 617.)  As in *Banks*, the court "set out a nonexhaustive list of considerations relevant to this determination, including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks." (*People v. Strong* (2022) 13 Cal.5th 698, 706; see *Clark*, at pp. 618-623.)

At the outset, we reject defendant's suggestion that this court must limit its consideration of evidence relevant to the *Banks*/*Clark* factors to the time period leading up to defendant and McMahon taking Jackson's belongings and no further.  We rejected a related argument in defendant's prior appeal when we held the initial robbery was still in progress under the escape rule, had the requisite causal relationship to the murder, and was part of a continuous transaction that ultimately resulted in Jackson's death, thus

9

allowing her conviction for first degree murder under a robbery-felony-murder theory. (*Okumura, supra*, C084467; see, e.g., *People v. Cavitt* (2004) 33 Cal.4th 187, 193, 196, 208-209.)

Viewing the entirety of the felony-murder transaction, we find substantial evidence supports the trial court's determinations that defendant was a major participant who acted with reckless indifference to human life. First, as to the major participation determination, substantial evidence supports the trial court's findings that defendant had a substantial role in the planning, knew her boyfriend wanted revenge and had obtained a gun, and helped lure Jackson to the apartment, where he would die. That day and the next, defendant worked with McMahon to lure Jackson through phone calls and texts to her apartment under the auspices of the sexual encounter to take place in the early morning hours of October 6.

Defendant and McMahon then sprung their trap on Jackson upon his entry to the apartment, with McMahon confronting Jackson at gunpoint and firing two warning shots at the floor near Jackson's feet to compel his compliance with demands that he strip and get on the floor while defendant watched from the kitchen. Defendant began tying Jackson to her massage table, but ultimately held the gun on Jackson to keep him compliant while McMahon finished securing the restraints.

Defendant then directly participated in Jackson's torture through the burning of his skin with heated butter knives, as demonstrated by the evidence and found true by the jury, which previously determined defendant had personally used "a heated metal implement" during the torture. As admitted by defendant, she believed Jackson "deserved it."

Defendant knew about the gun and in fact wielded it during the crime. On October 5, defendant was with McMahon when he secured the gun and ammunition for "protection" against Jackson. As noted *ante,* once the crime started, McMahon gave defendant the gun to hold on Jackson while McMahon tied Jackson to the table and then

10

defendant returned the gun to McMahon, despite having seen him threaten Jackson and fire it just moments before. This supports the trial court's determination that defendant supplied the murder weapon to him.

Moreover, substantial evidence supports the trial court's determination that defendant knew that both the crime and McMahon were dangerous. Again, defendant aided McMahon in luring Jackson (who had allegedly sexually assaulted her) to her apartment in the early morning while McMahon waited with the firearm obtained for that confrontation. Any possible illusions about the relative dangerousness of this activity were shattered when McMahon: (1) shot two warning shots near Jackson's feet shortly after his entry into the apartment, and (2) told defendant his life was over, put the gun in his mouth, then in defendant's mouth, before firing it at a cabinet near defendant.

Additionally, as found by the court, substantial evidence exists demonstrating that defendant did nothing to obtain help for Jackson following these foreshadowing gun discharges, even though defendant left the apartment alone multiple times without McMahon to dig for Jackson's money and to buy alcohol and cigarettes. During these trips, defendant had time to call the police, break off her participation in the crime, or do something else to aid Jackson, but did not. In fact, the gravity of the situation defendant and McMahon created may be seen in McMahon's statement that his life was over, and defendant's actions thereafter of trying to overdose on pills and slashing at her wrists.

Finally, after Jackson broke free of his bonds and was shot by McMahon while attempting to escape, defendant did not render first aid or contact authorities. She instead stood idly by while Jackson bled to death and, in fact, initially denied she knew anything, then said the victim had broken in, causing a delay in medical aid for Jackson, whom police did not know had been shot at first and was treated only as a burglary suspect until the gunshot wound was discovered. An examination of the relevant evidence and factors overwhelmingly demonstrates substantial evidence defendant was a major participant in this case.

11

Similarly, we find substantial evidence supports the trial court's determination that defendant acted with reckless indifference to human life. As previously discussed, defendant knew McMahon had a gun and ammunition and was hiding with it in the bathroom, but did not warn Jackson. Defendant did not try to dissuade McMahon from his revenge plot. Further, defendant became aware that McMahon was willing to use the gun and had a propensity for violence given his repeated firing of the gun in her apartment and his pistol-whipping of defendant during the course of events. Moreover, the gun was not the only weapon, as defendant herself burned the victim with heated knives. Although these burns were not lethal, they demonstrate defendant's willingness to inflict excruciating pain on Jackson as he was tortured over multiple days.

Further, defendant was present for the commission of the crime—and if one believes her most recent testimony about the shooting itself, she was physically present in the kitchen and watched McMahon pull Jackson off the fence before shooting him to stop his escape, and yet did nothing to intervene or help thereafter. Again, defendant had multiple opportunities to aid Jackson, but failed or refused to do so.

Substantial evidence also shows the duration of the crime was lengthy, occurring over nearly three days of captivity and more, when considering the phone calls and text messages luring Jackson to the apartment.

Finally, substantial evidence shows defendant did nothing to minimize the risks associated with the robbery. Again, she lured an unsuspecting Jackson to her apartment in the early morning hours where McMahon was armed with a gun. They then tied up and held Jackson for days, torturing him, and finally shooting him when he was caught trying to escape. This is the antithesis of minimizing the risk that Jackson would be harmed.

In conclusion, substantial evidence supports the trial court's determination that defendant was a major participant who acted with reckless indifference to human life and, therefore, defendant was still guilty of murder under the amended law. Accordingly, she

was not entitled to resentencing under section 1172.6.  In light of these conclusions, we do not reach defendant's remaining argument.

DISPOSITION

The judgment is affirmed.


/s/
_____
Krause, J.

We concur:


/s/
_____
Duarte, Acting P. J.


/s/
_____
Boulware Eurie, J.